UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HENRY ORMENO, et al.,

Plaintiffs,

v.

PASHA AUTOMOTIVE SERVICES,

Defendant.

Case No.  19-cv-07258-VC

**ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. No. 15

The question in this case is whether employees at a cargo processing facility for automobiles at Pier 80 in San Francisco are protected by the City's prevailing wage ordinance. The answer is yes.

I

Pasha Automotive Services is a cargo terminal operator that specializes in the shipment of automobiles. Pursuant to a contract with the City and County of San Francisco, the company operates a terminal on Pier 80, which is owned by the City. As discussed later in more detail, the function of a terminal operator is to receive, process, and store cargo at a shipping terminal until the cargo is ready to be loaded onto the ship for transport.

Henry Ormeno and Miguel Rivera, employees at the facility, have sued Pasha for allegedly underpaying them in violation of the federal Fair Labor Standards Act and San Francisco's prevailing wage ordinance. The plaintiffs have filed a motion for partial summary judgment, seeking only a ruling on whether they are covered by the prevailing wage ordinance.

San Francisco has three main ordinances governing compensation for workers: the minimum wage ordinance, the minimum compensation ordinance, and the prevailing wage

ordinance. Any covered employee who works full time or part time for any type of employer inside city limits is guaranteed an hourly minimum wage, and the rate is higher than the minimum set by federal or state law. *See* S.F. Admin. Code § 12R.4. So the minimum wage ordinance establishes a floor that protects employees in all fields, no matter who they work for. By contrast, the minimum compensation ordinance applies to companies that have services contracts with the City. § 12P.2(d). The minimum compensation ordinance sets a separate baseline wage for employees who perform work pursuant to the contracts. § 12P.3. This allows the City, through the exercise of its bargaining power, to secure fair wages for employees who work on city-owned property or for city-funded projects. § 12P.2(i)(1); *see, e.g.*, § 12P.4 (discussing San Francisco International Airport).

The prevailing wage ordinance gives additional compensation protection to employees of a subset of the companies that have contracts with the City. Every year, the San Francisco Board of Supervisors sets prevailing wage rates for employees who work in specified businesses or industries with a nexus to city property or services. The prevailing rate is based on a survey of the "rate of compensation . . . being paid to a majority of workers engaged in" the covered occupation, which can include, if applicable, collective bargaining agreements. § 21C.7(b). Workers singled out for protection by the prevailing wage ordinance include those who provide janitorial services, haul solid waste, and work at trade shows and street fairs. §§ 21C.2, 21C.5, 21C.8. When the prevailing wage ordinance applies, the employer must pay its covered employees the higher hourly rate specific to the particular classification instead of the lower hourly rate generally applicable to contractors under the minimum compensation ordinance. § 21C.7(a).

At issue in this case is section 21C.3 of the San Francisco Administrative Code, which is the portion of the prevailing wage ordinance that protects "any" person working in "a public off-street parking lot, garage, or storage facility for automobiles." § 21C.3(a). Although section 21C.3 applies to "any" person working for a contractor in this field, it offers an illustrative, non-exclusive list of the types of workers the ordinance seeks to protect: people engaged in tasks like

"washing," "polishing," "lubricat[ing]," "rent-car service," "parking," and "cashier." Pasha argues that it is not subject to section 21C.3 because the facility at Pier 80 is not a "public" facility. As a fallback argument, Pasha contends that even if the facility is "public" within the meaning of the ordinance, it's not a "storage facility for automobiles." Pasha contends that, for either of these reasons, the prevailing wage ordinance does not apply to work performed at the facility, meaning that the company need pay Ormeno and Rivera only in accordance with the City's minimum compensation ordinance.

## II

Pasha's primary contention is that its employees are not protected by section 21C.3 because they don't work at a "public" automobile storage facility.[1] This is so, the company contends, because the facility is not accessible to members of the public. Rather, manufacturers bring their automobiles to Pier 80; Pasha processes the automobiles and stores them until they're ready to be loaded onto cargo ships; another company loads the automobiles onto the ships; and then the automobiles are taken away to their international buyers. The lack of public access to this operation, according to the company, prevents Pier 80 from being a "public . . . automobile storage facility."

This argument might seem intuitive based on a colloquial understanding of the word "public." But if there's a difference between a colloquial understanding of a word and a statutory definition of that word, then the latter controls. *See Chen v. Franchise Tax Board*, 75 Cal. App. 4th 1110, 1123 (1998); *cf. Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 776 (2018). And Pasha's proposed interpretation is contrary to the definition contained in section 21C.3. This definition makes clear that a "public" facility is simply a facility on land owned or leased by the City (as opposed to private land). The definition makes no distinction between facilities that are accessible to the public and facilities that are not. It reads as follows:

"Public Off-Street Parking Lot, Garage, or Automobile Storage

---

[1] Nobody argues that Pasha operates a parking lot or a garage—the other two types of facilities covered by section 21C.3.

Facility" shall mean any off-street parking lot, garage, or automobile storage facility that is operated on property owned or leased by the City and County of San Francisco.

S.F. Admin. Code § 21C.3(b)(3).

Because the ordinance defines "public . . . automobile storage facility" in this manner—as any automobile storage facility operated on property owned or leased by the City—it's difficult to understand how a court could restrict its application to facilities that are publicly accessible without impermissibly rewriting the ordinance's definition. *See Wilson v. Cable News Network, Inc.*, 7 Cal. 5th 871, 892 (2019). Nor, incidentally, would such a restrictive definition bear any relation to the objectives of the prevailing wage ordinance. After all, the ordinance is designed to protect all employees who work for companies that contract with the City, to provide extra protection for those who lack job security in particular markets, and to permit union contractors to compete on equal terms with non-union contractors. *See Oxbow Carbon & Minerals, LLC v. Dep't of Industrial Relations*, 194 Cal. App. 4th 538, 546–47 (2011). Because the City has decided it does not wish to reward companies that undermine these objectives by underpaying their workers, it has chosen to use its power as a market participant to make sure that companies contracting with the City perform those contracts by using workers who receive a prevailing wage. As it relates specifically to section 21C.3, the City has chosen to make sure that if a parking lot, garage, or automobile storage facility is operating on public land, the workers on that facility will receive a prevailing wage. Yet Pasha's proposed construction of section 21C.3 ascribes to the City a desire to protect employees only at those facilities that happen to be accessible to the public, as if those workers warrant greater protection than the people who work at facilities closed off to the public. And the benefits of a stable prevailing wage—to workers and to the public—could not be obtained if pockets of the market are arbitrarily excluded for lack of public accessibility.

Pasha offers no answer for why excluding workers on City property not generally accessible to the public could be consistent with the prevailing wage ordinance. Instead, it makes three primary arguments. The first is a textual one, involving the following language from

elsewhere in section 21C.3: "Every . . . contractual arrangement for the operation of a public off-street parking lot, garage, or storage facility for automobiles on property owned or leased by the City and County of San Francisco must require [that the contractor pay its employees the prevailing wage]." S.F. Admin Code § 21C.3(a). As Pasha notes, if the adjective "public" already refers to a facility on city-owned land, there would have been no need to add the phrase "on property owned or leased by the City and County of San Francisco." That's true as far as it goes, but there's no rule prohibiting legislative drafters from being redundant. *See Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 107 (2011). And although it may sometimes be appropriate to resolve an *ambiguity* by assuming that the drafters did not intend a redundancy, it would not be appropriate to alter a clear statutory definition by reference to superfluous language in a different provision of the statute. *See General Development Co. v. City of Santa Maria*, 202 Cal. App. 4th 1391, 1395 (2012). As already discussed, there is nothing ambiguous about the definitional provision in section 21C.3, so there would be no justification for changing that definition based on ambiguous language in a neighboring subsection.

Second, Pasha points to language in its contract with the City. The contract contains a string of boilerplate provisions that bring to the contractor's attention a wide range of City laws—for example, restrictions on pesticide use, the use of tropical hardwood, and the use of bottled water. Within this mass of boilerplate are references to the minimum compensation ordinance (which, again, sets a compensation floor for all companies contracting with the City) and the prevailing wage ordinance (which sets a higher level of compensation for workers in specified fields). The provision calling out the minimum compensation ordinance says that the contractor "shall" pay workers "no less than" what is required by that ordinance. The provision calling out the prevailing wage ordinance says that the contractor "shall also" pay workers the prevailing wage "to the extent required by" the prevailing wage ordinance. Pasha argues that this equivocal language regarding the prevailing wage ordinance should affect the Court's interpretation of the ordinance itself (and that this language somehow suggests that the ordinance does not apply). But even if this language supported Pasha's interpretation of the ordinance—and

5

it's difficult to understand how it does—the language of a contract can't change the meaning of an ordinance. *Miller v. McKinnon*, 20 Cal. 2d 83, 88 (1942).

Third, Pasha relies on provisions of the California Vehicle Code in support of its restrictive interpretation of the phrase "public . . . automobile storage facility." It should be enough to say that if a city ordinance clearly defines a term one way, a decision by the California Legislature to define a term differently has no relevance. Absent ambiguity in the local definition, and absent any indication in the legislative history that the ordinance was adopted with reference to a state statute, there's no reason to look to the state statute. But even if it were appropriate to look to the California Vehicle Code, that wouldn't help Pasha. Pasha primarily points to the Vehicle Code's definition of "garage" as a building that stores vehicles "which belong to members of the general public." Cal. Vehicle Code § 340. But the question in this case is not whether Pasha's facility is a garage; it's whether Pasha's facility is a "public . . . automobile storage facility." Pasha has not pointed to any similar Vehicle Code provision regarding automobile storage facilities.[2]

In short, section 21C.3 does not merely protect workers at parking lots, garages, and automobile storage facilities that happen to be accessible to the public. It protects workers at all such facilities on property owned or leased by the City.

III

Because the ordinance explains exactly what makes a parking lot, garage, or automobile storage facility "public" for purposes of the prevailing wage, it's easy to conclude that Pasha's facility on Pier 80 is "public" within the meaning of section 21C.3. The somewhat more difficult question is whether the terminal counts as an "automobile storage facility" in the first place. The ordinance does not define "automobile storage facility," and the parties have not pointed to

---

[2] Pasha does point to provisions of the California Vehicle Code that speak of a particular type of "storage facility" for vehicles, namely, impound lots. *See* Cal. Vehicle Code §§ 22651, 22651.1. But a statute that seeks to regulate one particular type of storage facility that happens to be accessible to the public says nothing about whether automobile storage facilities should always be understood as open to the public.

legislative history that would shed light on the issue.

Pasha contends the drafters of section 21C.3 could not possibly have intended to cover every public contractor whose facility *happens* to store cars as a merely peripheral or trivial part of its operations. Perhaps that's true. For example, if a mechanic had a contract allowing it to repair vehicles on city-owned land (and if the contract did not include storing those vehicles), it seems unlikely that section 21C.3 would apply. But there's no need to explore the outer reaches of the provision, because the record in this case shows that vehicle storage is a significant part of Pasha's operations at Pier 80. And that's enough to make Pasha the operator of an "automobile storage facility" covered by the prevailing wage ordinance. This is the best interpretation of the ordinance even without applying any presumptions in favor of the plaintiffs, but it becomes even more compelling when one considers the guidepost that ambiguities in the scope and application of laws protecting workers in California should be resolved in favor of the worker. *See Oxbow Carbon*, 194 Cal. App. 4th at 547; *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1187 (2008); *see also Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1075 (N.D. Cal. 2015).

Pasha is, to use the parlance of the cargo industry, a "terminal operator." The job of a terminal operator is to receive cargo delivered to the terminal, to process that cargo, and to keep it until someone comes to load it onto the boat. Or vice versa: the terminal operator receives cargo that's coming off a boat, processes the cargo, and keeps it until someone comes to take it from the terminal. The task of loading the cargo onto the boat (or taking the cargo off the boat) is conducted by a separate entity called a "stevedore" or "stevedoring company." The Ninth Circuit has described the difference between a stevedore and a terminal operator as follows: "In the vocabulary of maritime cases, the stevedore is a company which provides loading and unloading services to shipowners. The stevedore hires longshoremen, individuals who do the work. A terminal operator stores the cargo before and after ocean transportation." *Whitcombe v. Stevedoring Services of America*, 2 F.3d 312, 314 n.1 (9th Cir. 1993) (internal quotation marks and citation omitted).

Consistent with this general understanding of the role of a terminal operator, the contract

between the City and Pasha contemplates that "storage" of automobiles is a significant part of the company's function. Pasha promised to operate the facility for the "receipt, handling, processing, storage, transporting, and delivery of cargo to/from the control and care of the stevedoring service provider." And although the contract does not specify the type of cargo being stored at Pier 80, it's obvious that the parties contemplated the storage of automobiles—Pasha has been part of the auto processing industry at various ports since the 1980s, and there is no indication in the record that it does anything other than process automobiles.

The declarations submitted by the plaintiffs in connection with this motion—declarations that have not been rebutted—also describe storage as a significant aspect of the facility's operations. Henry Ormeno, for example, states that after the vehicles are delivered to Pier 80, he inspects them, logs them, checks their batteries, and then parks them in designated spots on the pier, where the vehicles wait until Ormeno drives them to a location near the vessel boarding area from where the stevedores load them onto the cargo ships. Ormeno asserts that these vehicles "typically remain parked on the Pier 80 lot for one to three days, but are often stored even longer." In addition, Pasha receives vehicles at the Pier 80 facility that have been recalled by the manufacturer. Those vehicles are stored at Pier 80 "for many months" before they are "eventually transported off the Pier 80 facility in truckloads." Miguel Rivera's declaration describes Pasha's operations in similar fashion.

Furthermore, the declarations of Ormeno and Rivera show that they are the types of workers the prevailing wage ordinance seeks to protect. Recall that while section 21C.3 covers "any" employee working in a contractor's parking lot, garage, or automobile storage facility, it goes on to provide an illustrative list of the types of workers to be protected. This list is perhaps best understood as providing clues about whether a facility should be considered a covered facility in the first place—if a facility uses the types of workers listed in the ordinance, it is more likely the type of facility the ordinance was intended to cover. The list in section 21C.3 includes people who wash, polish, lubricate, and park vehicles. S.F. Admin Code § 21C.3(a). Ormeno and Rivera explain in their declarations—which, again, are unrebutted—that they do all these things.

8

The complaint filed by Ormeno and Rivera contains similar allegations about the functions they perform, and Pasha admits those allegations in its answer. *Compare* Complaint ¶¶ 27, 30–31, Dkt. No. 1, *with* Answer ¶¶ 27, 30–31, Dkt. No. 12.

In support of its contention that the Pier 80 facility is not an "automobile storage facility," Pasha cites a recent minute order issued by the San Mateo County Superior Court concluding that a car rental facility at the San Francisco International Airport (which is owned by the City) is not an automobile storage facility within the meaning of section 21C.3. *See* Dkt. No. 28-1. But that decision is clearly wrong. Among the types of workers called out by section 21C.3 are those who perform "rent-car service." S.F. Admin. Code § 21C.3(a). How could a rental car facility (which obviously stores cars) not be covered by an ordinance specifically designed to protect people who perform "rent-car services"? Why else would this type of worker have been called out by the ordinance?[3]

Aside from its failure to address the language of the ordinance, the Superior Court's ruling was based on a flawed assumption that a facility can be a "storage facility" only if its primary purpose is storage. The court reasoned that "[a] rental car agency is not in the business of operating a . . . storage facility any more than a restaurant is in the business of operating a refrigerator or food inventory room." This only begs the question. For example, imagine an ordinance that sets out to promote food safety by regulating food storage. Further imagine that it covers "food storage facilities." It seems logical to assume that restaurants are covered, given that restaurants regularly store food. Considering the purpose of this hypothetical ordinance (to help ensure that people are not eating adulterated food), there would be no reason to think that restaurants are excluded, at least absent a contrary indication in the text or legislative history. The fact that restaurants don't call themselves food storage facilities, and the fact that their primary objective is to serve food to customers, is beside the point from a regulatory perspective.

---

[3] There is no indication that the Superior Court applied the rule that ambiguities in worker-protection laws should be resolved in favor of the worker, although in any event the application of section 21C.3 to rental car facilities (more so than terminal operators) seems obvious from the language of the ordinance alone.

Pasha makes the same mistake in this case. True, the overarching purpose of the facility at Pier 80 is to enable cars to be shipped. But in achieving this purpose, cars must be stored, and this is far more than just a trivial aspect of the facility's operations. Accordingly, Pasha is operating an "automobile storage facility" as that term is used in the prevailing wage ordinance.

IV

The plaintiffs' motion for partial summary judgment is granted. Pasha's employees at Pier 80 are protected by San Francisco's prevailing wage ordinance. A further case management conference is scheduled for April 15, 2020, at 10:00 a.m. in San Francisco, Courtroom 4, 17th Floor to discuss next steps in this case. A joint case management statement is due April 8, 2020.

**IT IS SO ORDERED.**

Dated: March 12, 2020

VINCE CHHABRIA
United States District Judge